**WASHINGTON STATE FARM BUREAU, Oregon State Farm Bureau and Horticultural Ass'n of Western Washington, Plaintiffs-Appellees,**

v.

**Ray MARSHALL, Secretary of Labor, United States Department of Labor, Defendant-Appellant.**

No. 79–4449.

United States Court of Appeals, Ninth Circuit.

Submitted March 5, 1980.

Decided Aug. 13, 1980.

---

Dorianne Beyer, New York City, Ronald G. Whiting, Washington, D.C., argued for defendant-appellant; Kerry L. Adams, Atty., Dept. of Labor, Washington, D.C., on brief.

Jerome F. McCarthy, Tacoma, Wash., for plaintiffs-appellees.

Diane B. Cohn, William B. Schultz, Robert B. Stulberg, Washington, D.C., amici curiae.

---

1. Throughout this Opinion, the term "pesticide" will embrace fungicides and other chemicals.

Before TANG, SCHROEDER and POOLE, Circuit Judges.

POOLE, Circuit Judge.

This appeal from the grant of a permanent injunction against the Secretary of Labor presents questions concerning the interpretation and application of an amendment to the Fair Labor Standards Act (FLSA), 29 U.S.C.A. § 213(c)(4)(A) (1979), authorizing the Secretary to waive restrictions on employment of 10 and 11 year-olds in short-season agriculture harvesting under specified conditions. One such condition requires employers seeking the waivers to submit objective data to the Secretary demonstrating that the type and level of pesticides and chemicals used on the crops would not have an adverse effect on the health and well-being of the children employed. 29 U.S.C.A. § 213(c)(4)(A)(iii). The district court invalidated certain rules issued by the Secretary in implementing this provision and enjoined him from refusing to grant waivers to Washington and Oregon berry growers using the pesticides[1] Captan and Benomyl. Because the court relied upon erroneous legal conclusions, improperly substituted its judgment for the Secretary's and abused its discretion in issuing the permanent injunction, we reverse.

## I. FACTUAL BACKGROUND

Prior to 1974, exceptions to the child labor provisions of FLSA permitted limited employment of children under the age of 16 in agriculture. See 29 U.S.C. § 213(c) (prior to 1974 amendments). 1974 amendments to the Act prohibited virtually all employment of children under age 12 in subject agricultural employment. Pub.L.No. 93–259, 88 Stat. 55 (amending 29 U.S.C. § 213(c)(1)). In 1977 Congress amended the provisions so as to authorize the Secretary of Labor to issue waivers permitting the employment of 10 and 11 year-olds as hand harvesters for short-season crops. 29 U.S.C.A. § 213(c)(4)

(1979), *as amended by* Fair Labor Standards Amendments of 1977, Pub.L.No. 95–151, § 8, 91 Stat. 1245. The granting of any such waiver was conditioned, however, upon the Secretary's finding, based on objective data submitted by the applicant, that "the level and type of pesticides and other chemicals used would not have an adverse effect on the health or well-being of the individuals to whom the waiver would apply." 29 U.S.C.A. § 213(c)(4)(A)(iii) (1979).[2]

The Department of Labor's Wage and Hour Division (hereinafter "the agency")[3] proceeded to implement the waiver provision by promulgating rules, and on April 4, 1978, a proposed rule was promulgated regarding the pesticide condition which required employers to identify for each farm or field in which minors would be employed under the waiver:

"The standards of EPA, OSHA, NIOSH,[4] or other comparable authority which establish that each field so treated with the identified chemical and/or pesticide will not adversely affect the health or well-being of minors who will enter such field . . ." 43 Fed.Reg. 14068, 14070 (April 4, 1978) (proposed 29 C.R.F. § 575.-5(d)(2)).

During the comment period on the proposed rule pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 553, testimony and other information received indicated that currently established EPA and other federal standards had not been shown to be safe for children of ages 10 and 11. An EPA official informed the agency that

EPA's standards for the reentry of agricultural workers after application of pesticides had been established for adults, not for pubescent children, and that EPA could not establish any safe reentry times for 10 and 11 year-olds on the present state of its knowledge. In the light of these comments, the agency published a final rule on June 21, 1978, which provided that to satisfy the pesticide conditions applicants:

"will either have to submit a statement that no pesticides or other chemicals were used on the crop to be harvested or submit data which upon study by the Secretary or the Secretary's designee establishes safe reentry times for 10 and 11 year olds."

43 Fed.Reg. 26562, 26567 (June 21, 1978); 43 Fed.Reg. 27466, 27470 (June 23, 1978); 29 C.F.R. § 575.5(d) (1978).

This final rule was published after the start of the 1978 berry harvest. Upon the application of appellees, the district court granted a preliminary injunction preventing the Secretary from enforcing the above restrictions against those growers who had filed or applied for waivers—all of which had been denied.

In an effort to arrive at safe reentry intervals for 10 and 11 year-old harvesters, the agency commissioned Clement Associates, pesticide and toxicology specialists, to review data on chemicals used by the affected growers. Clement reviewed the scientific literature for about 30 chemicals and recommended a "Minimum Entry Time"

---

**2.** Other waiver conditions are that: the crop to be harvested is one with a particularly short harvesting season; severe economic disruption would be caused without the child labor; the employment would not be deleterious to the employees' health or well-being; persons age 12 and over are not available for such employment; and the particular industry has traditionally and substantially employed individuals under 12 without displacing substantial job opportunities for individuals over 16. 29 U.S.C.A. § 213(c)(4)(A) (1979). Any waiver must require that employment be outside of school hours, that the employees commute daily from their permanent residence, and not be employed under the waiver for more than eight

weeks between June 1 and October 15 of any calendar year. 29 U.S.C.A. § 213(c)(4)(B) (1979).

**3.** The terms "agency" and "Secretary" are used interchangeably herein. The Secretary of Labor delegated his waiver authority to the Administrator of the Wage and Hour Division. 40 Fed.Reg. 55913 (Dec. 2, 1975); 40 Fed.Reg. 56743, 56744 (Dec. 4, 1975).

**4.** Abbreviations refer to the Environmental Protection Agency, the Occupational Safety and Health Administration, and the National Institute for Occupational Safety and Health.

(MET) for certain chemicals. MET is the minimum period after the crop is treated with the pesticide before field workers would be permitted to enter the field to harvest the crop or perform other work. Clement's recommendations were based primarily on EPA's "Preharvest Intervals"— the minimum periods of time after the crop is treated before it may be harvested for consumption [5]—with an added safety factor for children. Clement Associates, Inc., *Safety Factors for Children Employed as Harvesters of Strawberries in Washington and Oregon* 3, 16–17 (August 7, 1978) [hereinafter cited as Clement First Report].

On August 18, 1978, based on the Clement studies (but without providing notice and comment procedures), the agency published a final rule establishing a list of pesticides or chemicals determined not to have an adverse effect on the health or well-being of minors employed under a waiver if specified "preharvest intervals" were observed. 43 Fed.Reg. 36623 (August 18, 1978), *amending* 29 C.F.R. § 575.5(d).[6] Intervals were established for the use of eight chemicals on strawberries and 17 chemicals on potatoes. The intervals were three days between treatment and entry for Captan and two days for Benomyl.[7]

Nine months later, on April 13, 1979, the agency published another final rule which deleted Captan from the approved list for strawberries because it and another chemical had been identified as suspended carcinogens. 44 Fed.Reg. 22059 (April 13, 1979), *amending* 29 C.F.R. § 575.5(b)(2). The agency found that "with respect to 10 and 11 year-old minors exposed to carcinogenic

substances, reentry times cannot be set for assurance of safety;" therefore, use thenceforth of those chemicals would preclude the issuance of a waiver. *Id.* at 22060–61; 29 C.F.R. § 575.5(d)(4) (1979). The deletion of Captan was based on another study by Clement which had concluded that no reentry interval for Captan would give the children reasonable assurances of safety. Clement Associates, Inc., *Captan*, p. 5 (March 20, 1979); *Interim Review of the Carcinogenicity of Five Pesticides* 1, 14–16 (March 30, 1979). In late March 1979, shortly after the new Clement recommendation was received, a Labor Department official informed Oregon and Washington berry growers of the problem with Captan; however, no formal notice and comment procedure was followed before publication of this rule.

On April 24, 1979, another final rule shifted Benomyl from the approved METs list to a list of pesticides or chemicals which "have been preliminarily reviewed by the Secretary or the Secretary's designee" but for which "there does not appear to be sufficient scientific data upon which to base minimum entry times." 44 Fed.Reg. 24058, 24060 (April 24, 1979), *amending* 29 C.F.R. § 575.5(d)(5).

An applicant for a waiver to use chemicals on that list would have to submit data which established safe reentry times for 10 and 11 year-olds. *Id.* Benomyl was included because of scientific evidence that it "is moderately or highly persistent in soil or on foliage and has serious toxic effects." 44 Fed.Reg. at 24059. Clement's second studies had learned of tests establishing Beno-

---

5. These intervals are designed to ensure that crop residues do not exceed residue tolerances after pesticide is applied under the prescribed conditions. EPA also establishes reentry intervals designed to protect harvest workers from exposure, usually via dermal absorption or inhalation of pesticide residues on crop surfaces or in the soil. See Clement Associates, Inc., Safety Factors for Children Employed as Hand Harvesters of Strawberries and Potatoes: Final Report 3–4 (May 18, 1979) [hereinafter Clement First Report). The reentry intervals for workers, however, had been established for

only four of the pesticides studied by Clement. *Id.* at 7; see 40 C.F.R. § 170.3(b)(2) (1978).

6. The waiver applicant could satisfy its burden merely by identifying the type and level of pesticide used and the date of last application prior to harvest (conforming to the specified interval). 43 Fed.Reg. at 36623.

7. The EPA Preharvest Interval for these two pesticides was zero days, i. e., the crop could be harvested (and consumed) as soon as the pesticide residues dried on the foliage. Clement First Report, at 11, 18.

myl as a mutagen and a teratogen[8] with effects on reproductive development. Clement Associates, Inc., Safety Factors for Children Employed as Hand Harvesters of Strawberries and Potatoes: Final Preliminary Report 15, 38 (April 20, 1979) and Final Report 44–47 (May 18, 1979). As with Captan, the deletion of Benomyl was preceded by communication with the growers but without formal notice and comment procedure.

Appellees then sued in the district court seeking a declaration that the rules "banning" Captan and Benomyl were void and a mandatory injunction directing the Secretary to issue waivers to the growers who complied with the August 18, 1978 rule.[9] The district court issued a preliminary injunction, which this Court vacated pursuant to an emergency appeal.

The district court then held a trial on the merits. The Clement consultants and other witnesses supported the agency's actions, while the growers' expert witness disputed key assumptions and conclusions of the Clement Reports. The court weighed the evidence and determined issues of credibility. It found the grower's expert to be more credible than the Secretary's witness. It decided that a waiver applicant could meet its statutory burden by showing that the post-spraying intervals, after which harvest workers are admitted to the field, were not less than the EPA Preharvest Intervals and that dermal and inhalation exposure are trivial in comparison to exposure by ingestion. The court concluded that since the applicants had made that showing, it meant that the Secretary had failed to perform a duty owed to plaintiffs' members by refusing to issue waivers. The court found that such refusals were arbitrary, capricious and not in accordance with law. It held that the regulations of April 13, and 24, 1979 (deleting Captan and Benomyl), were void and invalid for those reasons and also because they had been issued without notice or public comment procedure, or good cause for dispensing with these procedures. On July 5, 1979, a permanent injunction issued prohibiting enforcement of the FLSA child labor restrictions with respect to the harvesting of berries by 10 and 11 year-old children employed by plaintiffs' members who filed applications for waivers under the conditions set forth in 29 U.S.C. § 213(d) and the Secretary's regulations of June 23, 1978, and August 22 [sic], 1978.[10] On August 3, 1979, we stayed the judgment and expedited this appeal.

Meanwhile, in an entirely independent proceeding aimed at prohibiting implementation of the Secretary's waivers, the National Association of Farmworkers Organizations (an amicus herein) successfully challenged the rules granting waivers with respect to pesticides. The Court of Appeals for the District of Columbia Circuit (hereinafter "D.C. Circuit") found the rules *approving* the use of various pesticides, including Captan and Benomyl, were proce-

---

**8.** As defined by EPA, mutagenic substances induce "changes in the genetic complement of either somatic or germinal tissue in subsequent generations." 40 C.F.R. § 162.3(y) (1979); teratogenic substances produce or induce "functional deviations or developmental abnormalities, not heritable in or on an animal embryo or fetus." 40 C.F.R. § 162.3(mm) (1979).

**9.** On May 16, 1979, the agency approved Anilazina (Dyrene), a fungicide, for use as an alternative to Captan and Benomyl. 44 Fed.Reg. 28663 (May 16, 1979), *amending* 29 C.F.R. § 575.5(d)(2) and (3). The growers complained that this came too late for the 1979 harvest season.

**10.** With respect to use of pesticides, the Order specifically says in ¶ (1)(f):

"That employment pursuant to this Order shall be in compliance with applicable federal and state laws and any regulations issued under them, including regulations pertaining to the use of pesticides; providing, however, that the use of pesticides, including Captan and/or Benomyl under conditions and within tolerances which satisfy regulations issued by the Environmental Protection Agency (herein EPA) and applied in accordance with the pre-harvest intervals established by the defendant's regulations of August 22, 1978, or with respect to pesticides for which defendant has not regulated within pre-harvest intervals established by EPA, shall be considered to be in compliance with this order."

durally and substantively defective. *National Association of Farmworkers Organizations v. Marshall,* 628 F.2d 604, (D.C. Cir. 1980) (hereinafter cited as *NAFO v. Marshall*). Procedurally, that court held that those rules had been promulgated without the notice and comment procedure required by APA and without good cause for departing from such procedure. Substantively, it ruled that the Secretary had not had adequate assurance of safety to the children when he approved the minimum reentry times for use of the pesticides. By way of relief, the D.C. Circuit ordered the entry of a preliminary injunction preventing the application of the challenged regulations, this order to remain in effect until the completion of appropriate notice and comment rule-making under APA. *Id.,* at 623.[11] Meanwhile, no waivers could be granted in reliance on the list of approved pesticides. The effect of the D.C. Circuit's injunction has been to bar agency compliance with the orders of the district court in this case quite apart from the stay pending appeal granted by this Court.

After this decision, the agency published and solicited comment on a new proposed rule, 45 Fed.Reg. 15168 (March 7, 1980), the period for comment of which has now expired. The new proposed rule listed the same pesticides and other chemicals and set the same minimum entry times for strawberries and potatoes as had those portions of the regulation discussed above which had previously been published in final form but without opportunity for comment. *Id.* at 15169. The proposed rule disapproves use of Captan and Benomyl, as had been provided by the short-lived rules of April 13, 1979 and April 24, 1979. Neither chemical is accorded minimum entry times. *Id.* at 15170.

## II. SUBSTANTIVE REVIEW

■ Under APA a district court may, in its substantive review of an agency's final rule-making actions, decide all relevant questions of law, interpret the statute, and if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," hold unlawful and set aside the agency's actions, findings and conclusions. 5 U.S.C.A. § 706(2)(A) (1979). The court may not substitute its judgment for the agency's; rather, it is limited to an inquiry whether the agency's decision was based on a consideration of relevant factors and whether there was a clear error of judgment. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). Under this narrow standard of review, the district court in this case was obliged to affirm the agency's action if a reasonable basis existed for its decision. *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C.Cir. 1976) (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

■ The district court in this case construed the statute as requiring that the applicable safety standard conform to EPA Preharvest Intervals. Consequently it found that in not doing so the Secretary failed to perform a duty owed to plaintiffs when he denied them waivers, and that these actions were arbitrary and capricious. On appellate review, these conclusions of law are not accorded the deference given to findings of fact, and the reviewing court may freely set them aside if erroneous. *Miller v. United States,* 587 F.2d 991, 994 (9th Cir. 1978); *Asarco, Inc. v. EPA,* 616 F.2d 1153 (9th Cir. 1980); although, the grant of injunctive relief itself is reviewable only for abuse of discretion or use of an erroneous legal standard. *Securities and Exchange Commission v. Arthur Young & Co.,* 590 F.2d 785, 787 (9th Cir. 1979).

11. The decision left intact the provision of the regulation directing applicants to submit either a statement that they use no pesticides or data permitting the Secretary or his designee to determine the minimum entry times, 29 C.F.R. § 575.5(d)(1)(i)(A), (B) (1979). At 623 n. 106.

## A. *Selection of Safety Standard*

A key premise of the district court's reasoning was that in determining whether the use of pesticides would have an·adverse effect on the health or well-being of young harvest workers the Secretary was bound to adopt the Preharvest Intervals which EPA had established for protection of the general consuming public. Findings of Fact and Conclusions of Law, Findings XX, XXVII, XXVIII (July 5, 1979). We find this legal conclusion to be erroneous.

Initially, the premise upon which the district court proceeded in deciding how waiver applicants should meet their statutory burden was unsupported. It analyzed the Secretary's construction of the statute as requiring an assurance of zero risk to children, thereby establishing a practically impossible burden for applicants to meet and rendering the statutory waiver provision "a nullity." *Id.,* Findings XXIV, XXV, XXVI. Quite to the contrary, the agency insisted upon only reasonable assurance of safety to children. Indeed, it was this lesser assurance which figured prominently in the D.C. Circuit's rejection of the agency's approval of the pesticides. *NAFO v. Marshall, supra,* at 618–621. The agency had approved minimum entry times for the use of 19 chemicals on strawberries and 29 on potatoes by the time Captan and Benomyl were disapproved. See 44 Fed.Reg. 24059 (April 24, 1979). This fell demonstrably short of imposing an impossible burden and of rendering illusory the waiver provisions.

The agency had ample basis for declining to rely on the EPA standards. After the first proposed rule was published, EPA itself warned that it had no standards that could safely be applied to child harvesters and no data on which to base such standards.[12] EPA's reentry standards for field workers were developed for adults, not children. EPA's Preharvest Intervals for the protection of consumers do not take into account differences between ingestion and the other types (dermal and inhalation) and multiplicity of exposures facing field workers.[13] Because of the difficulty of establishing reentry standards for young workers, Clement Associates had used the Preharvest Intervals as a starting point for its recommendations to the Administrator. However, it found addition of a safety factor necessary for the reasonable protection of the children, warned that more detailed study would be needed to *assure* their safety, and refused to use the EPA standards or otherwise set Minimum Entry Times for carcinogenic pesticides (e. g., Captan) and highly toxic pesticides known to be persistent in soil or on foliage (e. g., Benomyl). Clement First Report, at 16–17; Final Report, at 5–6, 11–13.

Only a clear and strong expression by Congress should justify requiring the agen-

12. A letter from Stephen D. Jellinek, EPA Assistant Administrator for Toxic Substances, to the Administrator of the Wage and Hour Division, stated in part:

"[EPA reentry standards] have been developed on the basis of estimated adult tolerances to pesticide exposure. They do not take children into account. Epidemiologic information on prepubertal children is nonexistent . . . . There are no criteria which could be used to establish tolerance limits for working children. EPA cannot say that the reentry times the Agency has set for adults will be safe for children 10 and 11 years of age. Likewise, the Agency cannot say what is or is not a safe standard for children simply because there is no data on which to base such an estimation and the factors involved are much more complex than for an adult." Defendant's Trial Exhibit E. At the public hearings on the proposed rule and in a letter of June 13, 1978, EPA representatives reiterated these views. The letter made it clear that EPA was not "preempt[ing] the decision to be made by the Department of Labor":

"The Department [of Labor] must make its own judgment on whether or not there is sufficient information in an application to grant the waiver . . . . EPA believes that the Department of Labor must exercise great care in making the judgment of whether or not to grant a waiver." Defendant's Trial Exhibit F.

13. Clement Associates noted that while these standards would generally protect field workers as well as consumers, there are exceptions, such as when a pesticide is applied to a crop shortly before harvest and the external surfaces of the plant may have pesticide residues although the chemical is not absorbed into the edible portions. Clement Final Report, at 5, 9–10.

cy to rely upon EPA's consumer-oriented standards for all pesticides considered in the face of evidence that those standards do not protect 10 and 11 year-old field workers. In searching for such a requirement, we are mindful that exceptions to FLSA protections must be narrowly construed. *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 295, 79 S.Ct. 756, 759, 3 L.Ed.2d 815 (1959); *Brennan v. Keyser*, 507 F.2d 472, 477 (9th Cir. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). Applying that admonition, we conclude that no such requirement is to be found in the language of the statute, other evidence of Congressional intent, or the federal scheme for regulation of pesticides.

The waiver provision of FLSA requires applicants to submit "objective data" but does not mention EPA or any other particular sources or standards. 29 U.S.C.A. § 213(c)(4)(A)(iii) (1979). The Secretary may not grant the waiver unless *he* finds, based on such data, that there would be no adverse effects of the pesticides on the children. *Id.* The statute thus places the responsibility and discretion in the Secretary of Labor. The district court's construction would effectively remove that responsibility and discretion from agency determination.

The legislative history of the waiver provision does include some references to EPA pesticide regulation but gives no indication that the sponsors of the amendment or others intended to have EPA standards simply transplanted into FLSA.[14]

 The district court reasoned that Congress did not intend the Secretary to assume responsibilities delegated to EPA un-

der the statutory scheme for pesticide regulation in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), as amended, 7 U.S.C.A. § 135 et seq. It is obvious, however, that if Congress wanted only compliance with EPA standards, this existing scheme would make the waiver provision's pesticide condition superfluous, since growers would presumably have to comply with EPA standards regardless of the harvest workers' ages. Nothing in the FLSA provision or its legislative history suggests that Congress intended that the elaborate EPA procedures for removing a chemical from *general* use, 7 U.S.C.A. § 136d (1979), would have to be invoked before the Secretary of Labor can prevent its use in fields where 10 and 11 year-old children are employed. Moreover, the FIFRA standards for pesticide registration are less stringent than the standard for the protection of child harvesters under the FLSA amendment and envision a kind of balancing not called for in the FLSA provision, which is concerned only with the health and well-being of the 10 and 11 year-old children.[15]

This concern may or may not require absolute assurance of zero risk to the children's health, as suggested by the D.C. Circuit in *NAFO v. Marshall, supra*, at 618–620. However, we find it unnecessary to decide the correctness of this suggestion and decline the parties' invitation to express a contrary view for this circuit and thereby to invite Supreme Court review. We hold only that the district court erroneously required the Secretary to rely on existing EPA standards for all pesticides. We need go no further because we decide that the agency's actions in this case regarding

---

**14.** To the contrary, when the waiver proposals were under consideration, Senator Williams of New Jersey voiced concern about hazards from pesticides, such as "DNBP" and thrithion, that were not being prevented by existing EPA regulation, and sponsored the pesticide amendment "to assure that the Secretary of Labor will look into the question of exposure to these chemicals as part of his certification process." 123 Cong.Rec. S16626 (Oct. 7, 1977). Senator Hathaway of Maine, a sponsor of the waiver provision, acceded to this amendment, while acknowledging the strictness of existing EPA regulation, "to make sure that there is no dan-

ger whatsoever from any toxic material." *Id.* at S16627.

**15.** FIFRA provides for registration of pesticides that will not cause "unreasonable adverse effects on the environment." 7 U.S.C.A. §§ 136a(c)(5)(C), (D); 136a(c)(7); 136a(d)(1)(B); 136d(b); 136d(e)(1) (1979). This term is defined as "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C.A. § 136(bb) (1979).

Captan and Benomyl were not arbitrary or capricious under either the "reasonable assurance" standard applied by the agency or the "absolute assurance" suggested by the D.C. Circuit.

### B. Specific Actions on Captan and Benomyl

■ The district court improperly substituted its judgment for the agency's and erroneously concluded that the refusal to grant waivers to growers using Captan and Benomyl was arbitrary and capricious.

■ The court made its decision after a trial *de novo*, in which it heard new testimony from both sides. Although the statute requires waiver applicants to submit objective data to the Secretary in the first instance, the court received and relied upon new expert testimony from the growers which had not been submitted to the agency, either before or after adoption of the rules deleting Captan or Benomyl. Since this was a review of informal rule-making action under the APA's arbitrary and capricious standard, 5 U.S.C.A. § 706(2)(A) (1979), the district court should have scrutinized the evidence that was before the agency when it made its decision, instead of conducting a full-fledged and independent evidentiary hearing. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Asarco, Inc. v. EPA, supra*, at 1159; *Bunker Hill Co. v. Environmental Protection Agency*, 572 F.2d 1286, 1292 (9th Cir. 1977). To the extent the district court might properly have looked outside the administrative record, it failed to limit its review to background information, explanations of the record, and information needed to determine whether the Secretary considered the relevant factors and sufficiently explicated his decision. *Asarco*, and *Bunker Hill, supra; Independent Meat Packers Association v. Butz*, 526 F.2d 228, 238–39 (8th Cir. 1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976).

The evidence before the agency provided a rational and ample basis for its decisions on Captan and Benomyl. The growers had not submitted objective data demonstrating the safety of these pesticides, and since EPA had disclaimed that its standards applied to child harvesters, the agency reasonably proceeded to develop its own data through separate studies conducted by a scientific expert organization.[16] The consultant's findings that Captan was carcinogenic (and possibly mutagenic and teratogenic) were based on a screening of 340 abstracts from 40 primary sources, including a three-year bioassay by the National Cancer Institute. Clement concluded that safe reentry times could not be set to assure the children's safety, since there was no acceptable way to determine a "no-effect level" of exposure to carcinogens. Clement Associates, Inc., Captan (March 20, 1979); Interim Review of the Carcinogenicity of Five Pesticides 1, 14–16 (March 30, 1979); Final Report at 11, 48–57. As to Benomyl, the consultants described a large battery of tests which established that it was a mutagen and teratogen, had effects on reproduction development, and was known to be moderately or highly persistent in soil or on foilage. Clement Final Report, at 44–47; Final Preliminary Report, at 15, 38. The report recognized that it was scientifically reasonable to assume that children are more susceptible than adults to toxic effects and that it was particularly important to protect them against chronic or delayed effects on the reproductive system, central nervous system and other organs developing in pre-adolescents. Clement Final Report, at 6; see also Clement First Report, at 5–9. With such evidence before it, the agency was fully justified in concluding that no objective data, from the growers or other source, demonstrated that the use of Captan and Benomyl would have no adverse

---

**16.** The growers themselves rely upon the initial Clement studies which provided the basis for the August 18, 1978, approval of Captan and Benomyl (and other pesticides).

In *NAFO v. Marshall, supra*, the court's finding that Clement Associates was qualified to review the available scientific studies (No. 79–1044, D.D.C. June 7, 1979), was not disturbed on appeal.

effects on the 10 and 11 year-old harvesters.[17]

Even if the agency had had the opportunity to consider the evidence presented by appellees at trial, its decisions on Captan and Benomyl would not have been arbitrary or capricious. The grower's chief expert witness, Dr. Witt, and the agency's witnesses were in dispute as to such matters as the ability to identify a no-effect level and compare it with actual field exposure, the sensitivity of children to toxic effects of biologically active chemicals, and the amounts of dermal or inhalation exposure received in the fields compared to exposure from eating strawberries. The district court preferred the positions of the grower's expert which it found more credible; but weighing an expert's opinions against Clement's findings and other testimony would have been the Secretary's, not the court's, task. Should the Secretary not come to the same credibility results as did the court, it would not have meant failure to consider the relevant *factors* in making his decision. Given his clear statutory mandate to protect the children, it would have been reasonable—if not imperative—for him to prefer the advice of the more cautious expert opinions, which were based on an independent review of available data.[18]

We conclude that the agency did consider the relevant factors and that it made no clear error of judgment in removing Captan and Benomyl from the list of approved pesticides and in refusing to grant waivers where these pesticides were used. The actions were, therefore, not arbitrary, capricious, or abuses of discretion. *Bowman Transportation, supra.* Indeed, given his statutory responsibility, the Secretary could hardly have done otherwise.

### III. PROCEDURAL REVIEW

Under the APA, the court shall set aside agency actions that are "without observance of procedure required by law," 5 U.S.C.A. § 706(2)(D) (1979), as well as those found to be substantively defective. The district court declared the rules of April 13, 1979, and April 24, 1979, void and invalid because they were issued without notice and public procedure, in violation of the rulemaking requirements of the APA, 5 U.S.C.A. § 553 (1979).[19] The court concluded that the agency had made no showing of "good cause" for resort to the Act's "emergency procedures." See 5 U.S.C.A. § 553(b)(B) (1979), which creates an exception to the notice and public procedure requirements "when the agency for good cause finds" that they are "impracticable, unnecessary, or contrary to the public interest." As with the district court's substantive conclusions, we are free to make an independent determination on this question of law. See, e. g., *Asarco, Inc. v. EPA, supra,* at 1160; *Reeves v. Simon,* 507 F.2d 455, 458–59 (Em.App.1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975).

---

**17.** The D.C.Circuit arrived at the same conclusion with respect to all the pesticides initially approved by the agency. *NAFO v. Marshall, supra,* at 617-618.

**18.** The district court further substituted its judgment and usurped the agency's function in its specific findings concerning the safety of Captan and Benomyl. *The court found that* they had been used in Washington and Oregon for 25 and eight years respectively, without any reported episode of injury or health problems to young children or others when used in accordance with label directions. *This finding by* the court does not obviate the Secretary's legitimate concern with the potential long-term and chronic effects of these pesticides of which he had been forwarned but on which he had yet no evidence from *longitudinal or other studies of* children who had been exposed to them. The

district court's findings observed that the Agency's experts had admitted that Captan and Benomyl would be as dangerous to 12 and 13 *year-old children as to 10 and 11 year-olds.* Again, this did not minimize the Agency's concern with the health of the younger children, for whom the statute's pesticide protection was intended.

**19.** With stated exceptions, the APA generally requires publication of notice of proposed rule making in the Federal Register, 5 U.S.C.A. § 553(b), at least 30 days before the effective date of the rule, 5 U.S.C.A. § 553(d), followed by an opportunity for interested persons to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation, 5 U.S.C.A. § 553(c).

We disagree with the district court's conclusion and hold that the agency did have good cause for removing Captan and Benomyl from the approved list without notice and public comment procedures. Under the facts present here, these procedures were impractical and their observance not in the public interest because the 1979 strawberry harvest season was already at hand and as a result there was immediate need both to protect the children and to inform interested growers prior to their spraying. 44 Fed.Reg. 22059, 22060 (April 13, 1979); 44 Fed.Reg. 24058, 24059 (April 24, 1979). Since the rule changes would not preclude the issuance of waivers to growers who used Captan or Benomyl prior to the effective date of the changes, *id.*, delaying that effective date would have permitted more pesticides to be sprayed in the interim on strawberries to be harvested by children beginning in June.[20]

The district court's underlying concern was that the growers had not had a hearing before the agency adopted the rules. In informal rule-making, the APA does not require a public evidentiary hearing or provision for oral presentation. 5 U.S.C.A. § 553(c) (1979); *California Citizens Band Association v. United States*, 375 F.2d 43, 50 (9th Cir. 1967), *cert. denied*, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). While the agency did not allow an advance period for other forms of participation required by the APA, it did communicate informally with interested growers and did not afterwards shut the door. The rules stated that nothing therein would preclude employers from submitting data that would warrant reconsideration of the agency's determinations. 44 Fed.Reg. at 22060 (April 13, 1979); 44 Fed.Reg. at 24059 (April 24, 1959). The employers instead chose to litigate.

Appellees contend that, at least as to Captan, the information about potential hazards was available well before March 1979, and the Assistant Secretary could not explain why he did not act sooner. The first Clement study in August 1978 had noted the reported carcinogenic, mutagenic and teratogenic effects of Captan, but nevertheless recommended a three-day minimum entry time. Clement First Report, at 14, 18. The agency adopted this recommendation in its August 18, 1978, rule. When Clement recognized its mistake and revised its recommendation in March 1979, the agency acted promptly to undo the potential harm. Postponing the effective date of this remedial action would have compounded the earlier mistake, with possible adverse consequences to the children (not the agency).

Our conclusion of good cause for bypassing notice and comment procedures is not inconsistent with the D.C. Circuit's conclusion that time for these procedures was necessary "to insure sufficiently protective regulations for issuing waivers" while the statute protected the children in the interim. *NAFO v. Marshall, supra,* at 621. Adequate protection of the children *was* the purpose and effect of the challenged actions here, while such protection was found lacking in the agency's actions approving the use of pesticides in *NAFO.*

In deciding that this overriding purpose justified an exception here, we in no way intend to encourage such practices elsewhere. Our conclusion is strictly limited to the particular facts of this case.

Finally, we note that even had the district court correctly concluded that there was no good cause to bypass notice and comment procedures, the appropriate remedy for this procedural defect would merely have been to order the agency to undertake the appropriate procedures before giving effect to the rules. *American Frozen Food Institute v. Train*, 539 F.2d 107, 135 (D.C. Cir. 1976). Under court order pursuant to the decision in *NAFO v. Marshall, supra,* the agency has already acted to cure such defects in the rules issued after June 21, 1978, by publishing a new proposed rule and

---

**20.** Based on appellees' information, the district court found that the fungicides must normally be applied at first bloom in mid or late April.

Findings of Fact and Conclusions of Law, Finding XIII (July 5, 1979).

allowing opportunity for comment. 45 Fed. Reg. 15168 (March 7, 1980). Meanwhile, the status quo to be preserved would have been the June 21, 1978, rule placing the burden on waiver applicants to demonstrate safe reentry times for any pesticides used, not the August 18, 1978, rule approving minimum entry times for Captan and Benomyl. The latter rule was also adopted without notice and public participation and, according to the decision in *NAFO v. Marshall, supra*, without good cause for bypassing these procedures.

For the above reasons, we conclude that the agency's failure to undertake notice and comment procedures before adopting the final rules on Captan and Benomyl provides no basis for the district court's permanent injunction.

### IV. CONCLUSIONS

The Secretary of Labor did not violate his statutory duties under the FLSA in refusing to grant waivers in reliance on EPA pesticide standards for consumer protection. He did not act arbitrarily or capriciously or abuse his discretion in acting to prevent the use of Captan and Benomyl on berry crops in fields where 10 and 11 year-olds would be employed under the statute's waiver provision. Given the particular risks and circumstances presented to him, his adoption of rules to this effect without notice and comment procedures did not violate the APA and, in any event, does not justify upholding the relief granted by the district court.

The judgment granting the permanent injunction is reversed and the case is remanded for further proceedings not inconsistent with this Opinion.

REVERSED and REMANDED.