18 F.3d 1468
 24 Envtl. L. Rep. 21,303
 NORTHWEST MOTORCYCLE ASSOCIATION, an off road vehicle
association in the State of Washington, Plaintiff-Appellant,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE; Michael Espy,
* Secretary, U.S. Department of Agriculture;
The United States Forest Service; F. Dale Robertson, Chief,
U.S. Forest Service, Defendants-Appellees,
and
Washington Trails Association; Washington Wilderness
Coalition; et al., Intervenors-Appellees.
 No. 92-36784.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 31, 1994.
Decided March 17, 1994.
 
 William Perry Pendley and John G. Nelson, Mountain States Legal Foundation, Denver, CO, for plaintiff-appellant.
 Louise F. Milkman, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.
 Karl F. Forsgaard, Bogle & Gates, Seattle, WA, for intervenors-appellees.
 Appeal from the United States District Court for the Eastern District of Washington.
 Before: WRIGHT, REAVLEY,** and LEAVY, Circuit Judges.
 
 ORDER
 
 1
 For the reasons stated in the memorandum opinion of the district court filed on August 7, 1992, in the Eastern District of Washington, we affirm the grant of summary judgment in favor of the appellees.
 
 
 2
 We adopt the district court's memorandum opinion as appended, finding it dispositive of all issues on appeal.
 
 
 3
 AFFIRMED.
 
 
 4
 MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, INTER ALIA
 
 JUSTIN L. QUACKENBUSH, District Judge:
 
 5
 BEFORE THE COURT is Plaintiff's Motion for Summary Judgment (Ct.Rec. 44), defendants' Cross-Motion for Summary Judgment (Ct.Rec. 36), and Intervenor-Defendants' Washington Trails association, the Wilderness Coalition, the North Cascades Conservation Council, and the Mountaineers (the "Intervenors") Cross-Motion for Summary Judgment (Ct.Rec. 39). A hearing on these motions was held on July 31, 1992. William Perry Pendley, of the Mountain State Legal Foundation, and Jerry Boyd appeared on behalf of the Plaintiff, while the Defendants were represented by Brian Ferrell, of the United States Department of Justice, Environmental & Natural Resources Division. The Intervenors were represented by Ronald G. Morrison. Having reviewed the record, heard from counsel, and fully considered these matters, the court enters this order to memorialize its oral rulings.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 6
 The Wenatchee National Forest, like all national forests, is governed by a Land and Resources Management Plan. In formulating the plan for the Wenatchee National Forest, nine alternative plans were considered by Defendant United States Forest Service. (A.R. 5 at page 12.) A draft Environmental Impact Statement (EIS) analyzing the alternatives was published in June 1986. (A.R. 93.) A final EIS was published in February 1990. (A.R. 32.) In March 1990, the defendant United States Forest Service issued the Land and Resource Management Plan Record of Decision for the Wenatchee National Forest, which stated that Alternative C of the final EIS had been selected as the Wenatchee Forest Plan. (A.R. 30.) Included in Alternative C was the prohibition of off-road vehicle (ORV) use in the area surrounding the North Fork of the Entiat River and the adjacent Pyramid Mountain area in the Wenatchee National Forest ("North Entiat").
 
 
 7
 The goal of the Land and Resource Management Plan for the Wenatchee National Forest ("the Plan") is to "[p]rovide a well balanced array of recreation opportunities across the breadth of the recreation opportunity spectrum in accordance with resource capability, public demands and expectations for outdoor recreation." (A.R. 31 at page IV-2.) The Plan also seeks to "[p]rovide a diverse system of safe, well-maintained trails for the enjoyment of all users." Id.
 
 
 8
 The Plan divides the Wenatchee National Forest into 24 management areas, each with different management goals, resource potential, and limitations. (A.R. 31 at page IV-105.) One such management area is classified RE-3, "Dispersed Recreation, Unroaded, Non-Motorized." The management goal of RE-3 classified land is to "[p]rovide dispersed recreation in an unroaded, semi-primitive, non-motorized or primitive setting." (A.R. 31 at page IV-171.) RE-3 designated lands include "unroaded areas in which trails are evident and maintained for non-motorized users. Landscape changes are generally not evident to those walking through the area. The area is essentially a natural or natural appearing environment. There is little evidence on-site of other users." Id. In the Defendants' Plan, a RE-3 prescription was given to the North Entiat area, thereby prohibiting ORV use in the area.
 
 
 9
 On May 23, 1990, the Plaintiff, an ORV association in the State of Washington, submitted an administrative appeal challenging the Defendant United States Forest Service's decision to close the North Entiat to motorized trailbike use. The Plaintiff claimed that this decision illegally resolved the alleged conflict between hikers and ORV users by arbitrarily closing the trails to the latter group. The Plaintiff also asserted that the Forest Service's decision created an illegal buffer zone around a nearby Wilderness area. On February 19, 1991, the Defendant United States Forest Service denied the Plaintiff's appeal and affirmed the decision to implement the Plan.
 
 
 10
 On March 4, 1991, the Plaintiff submitted a Request for Discretionary Review to Defendant Edward Madigan, the Secretary of Agriculture, in order to exhaust all administrative remedies. The Plaintiff alleges that no response was received, thus, it asserts that exhaustion of remedies has occurred. The Defendants do not challenge this contention.
 
 
 11
 On October 14, 1991, the Plaintiff filed a complaint with this court seeking injunctive and declaratory relief based on alleged violations of the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A), and of the Washington State Wilderness Act of 1984, Pub.L. No. 98-339, Sec. 9, 98 Stat. 299, 305 (1984).
 
 
 12
 On March 25, 1992, the Intervenors, a group of nonprofit conservation organizations dedicated to the preservation and proper management of Washington's public lands, including the national forests located therein, filed a Motion for Leave to Intervene (Ct.Rec. 15). The court granted the Intervenors' motion in an order filed on April 22, 1992. (Ct.Rec. 33.)
 
 
 13
 On June 8, 1992, the parties filed their respective cross-motions for summary judgment, which are now before the court.
 
 II. STANDARD OF REVIEW
 
 14
 Under the Administrative Procedure Act, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law...." 5 U.S.C. Sec. 706(2)(A). The Supreme Court has held that the ultimate standard of review under 5 U.S.C. Sec. 706(2)(A) is a narrow one, noting that a court is not empowered by section 706(2)(A) to substitute its judgment for that of the agency. Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983); see also Sierra Pacific Indus. v. Lyng, 866 F.2d 1099, 1105 (9th Cir.1989). However, the Court also noted that a reviewing court must conduct a searching and careful inquiry into the facts. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971).
 
 
 15
 In reviewing an agency's decision under section 706(2)(A), a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416, 91 S.Ct. at 416. After considering the relevant data, the court must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " Motor Vehicle Manufacturers, 463 U.S. at 43, 103 S.Ct. at 2866 (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). In order for an agency decision to be upheld under the arbitrary and capricious standard, a court must find that evidence before the agency provided a rational and ample basis for its decision. Washington State Farm Bureau v. Marshall, 625 F.2d 296, 305 (9th Cir.1980).
 
 
 16
 Further, "[w]here review involves an agency's construction of the statute it administers, the court must first give effect to the unambiguously expressed intent of Congress." Sierra Pacific, 866 F.2d at 1105. If the statute is silent or ambiguous concerning the issue in dispute, the court must then determine if the agency's interpretation of the statute was based on a permissible construction of the statute. Id.
 
 III. STANDARD FOR SUMMARY JUDGMENT
 
 17
 The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. Zweig v. Hearst Corp., 521 F.2d 1129 (9th Cir.1975), cert. denied, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). The moving party is entitled to summary judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute. Fed.R.Civ.P. 56(c); Semegen v. Weidner, 780 F.2d 727 (9th Cir.1986). When reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. See v. Durang, 711 F.2d 141 (9th Cir.1983).
 
 
 18
 As mentioned previously, this case involves review of a final agency determination under the Administrative Procedure Act, 5 U.S.C. Sec. 706; therefore, resolution of this matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the administrative record, to which the Plaintiff and the Defendants have stipulated to. (Ct.Rec. 43.) Because this case does not present any genuine issues of material fact, summary judgment is appropriate.
 
 IV. DISCUSSION
 
 19
 The Plaintiff's suit centers on two contentions. First, it argues that the Defendants' conclusion that "user conflict" required it to close the North Entiat area to ORVs was arbitrary and capricious. The Plaintiff also contends that the prohibition on ORV use in the North Entiat area was intended to create a "buffer zone" around the adjacent Glacier Peak Wilderness Area.
 
 
 20
 A. Defendants' Decision to Close the North Entiat Trails to ORV use was not Arbitrary and Capricious
 
 
 21
 In the Plaintiff's motion for summary judgment, it is argued that the Defendants' decision to close the North Entiat area to ORVs was not supported by a reasonable basis in fact. The Plaintiff also argues that the Defendants' decision was not supported by a reasonable explanation of its rationale. In their cross-motions for summary judgment, the Defendants and the Intervenors dispute these contentions and argue that the Defendants' decision was made after consideration of all of the relevant factors. They also assert that the Defendants did not commit a clear error in judgment in deciding to ban ORV use in the North Entiat area.
 
 
 22
 1. Defendants had a Rational and Ample Basis to Ban ORVs from the North Entiat Area
 
 
 23
 As framed by the Plaintiff, the issue before the court is "whether the [administrative] record contains enough evidence of 'user conflict' on the North Entiat trails to enable a reasonable person to conclude that such conflict exists." (Ct.Rec. 45 at page 9.) It is correct that an agency must have a rational and ample basis in fact for its decision. See Washington State Farm Bureau v. Marshall, 625 F.2d 296, 305 (9th Cir.1980). However, "user conflict" is not the only factor in the ORV restriction equation. Pursuant to Executive Order 11644, the Defendants are directed to:
 
 
 24
 establish policies and provide for procedures that will ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various users of those lands.
 
 
 25
 (A.R. 105) (Codified at 36 C.F.R. Sec. 295.2(a)--use of trails by ORVs that will cause conflicts with other forest visitors will be restricted until the conflict can be eliminated). Although there are several factors which the Defendants had to examine in their decision to exclude ORVs from the North Entiat area, the presence of "user conflict" was chief among their concerns.
 
 
 26
 The definition of "user conflict" is not found in any regulation, pertinent law, or Forest Service policy. See (A.R. 5 at page 15). Therefore, the procedures for determining the extent of "user conflict" are developed individually for each forest. Id. The Plan in dispute here measured "user conflict" by the extent of user input regarding conflict and the collective experience of Forest Service personnel, including an Interdisciplinary Team established to analyze ORV use in the Wenatchee National Forest. (A.R. 32, Appendix K at page K-86, K-87.) The Plaintiff does not contest the validity of the Defendants' methodology for determining "user conflict." (Ct.Rec. 58 at page 3 n. 2.) Rather, it contends that the Defendants' conclusion that "user conflict" existed was arbitrary and capricious.
 
 
 27
 For the purpose of this action, it is reasonable to conclude that the Defendants used "conflict" in its normal everyday sense, that is, a "clash or divergence of opinions, interests, etc.; a mental or moral struggle occasioned by incompatible desires, aims, etc." Webster's New Collegiate Dictionary (2d Ed.) viewed in light of this definition, the Administrative Record supports the Defendants' finding that "user conflict" existed in the North Entiat area, thus warranting the closure of the North Entiat area to ORV use. The following is the evidence in the administrative record which supports the Defendants' findings:
 
 
 28
 On April 30, 1987, during the development of the Plan, Representative Rod Chandler, of the United States Congress, forwarded a letter to Gary Heath, Acting Supervisor of the Wenatchee National Forest, stating that he had received over 500 letters from people who consider it a definite "conflict" for non-motorized trail users and ORVs to be using the same trails. (A.R. 85.) Representative Chandler also commented that "Wenatchee has become known as the worst National Forest in Washington state for conflict between ORV enthusiasts and non-motorized trail users." Id.
 
 
 29
 In addition, the Defendants met with special interest groups, including ORV users, horsemen, and hikers. Through these meetings, the Defendants discovered that the ORV users did not perceive a "conflict" between their use of the Wenatchee National Forest and non-motorized uses. (A.R. 43.) However, the Defendants found that non-motorized users disagreed. In fact, the non-motorized trail users felt that, by allowing the coexistence of motorized and non-motorized trail access in the North Entiat area, the Defendants were not fulfilling their obligation to manage the Wenatchee National Forest so as to avoid "user conflict." Id.[1]
 
 
 30
 Further, the Defendants received approximately 3,000 letters during the public comment period of the planning process.[2] As stated in the final EIS: "Not counting the timber industry ballot, [ORV use] received the most comments of any issue. The majority of the comments were against ORV use in general, but especially against any expansion of ORV use...." (A.R. 32, Appendix K at page K-8.) Many of these comments addressed issues concerning ORV use in the North Entiat area. For example:
 
 
 31
 I have personally spent several days as a volunteer working on trail maintenance of the North Fork Entiat Trail over the past few years.... Unfortunately I have noticed a significant increase in the presence of trailbikes and their destruction in the past two years. The motorbikes tear up the trails and turn them to several inches of dust, and they plow through meadows leaving ruts and destroying wildflower displays....
 
 
 32
 (A.R. 42 at 3429.)
 
 
 33
 North Fork of the Entiat Valley.... The plan should consider a trail from Cottonwood to Myrtle Lake away from present trail to eliminate conflicts with horseman and hikers going to the wilderness.
 
 
 34
 (A.R. 42 at 3483.)
 
 
 35
 If more trails can be constructed to keep ORV users separate from hikers and horseman I thank a lot of conflict can be eliminated.
 
 
 36
 (A.R. 42 at 26,749.)
 
 
 37
 I have seen the damage done by the ORVs to trails in the [North] Entiat, and believe that backcountry ORV use should be restricted.
 
 
 38
 (A.R. 42 at 26,635.)
 
 
 39
 Hiking areas should be established in the Teanaway and North Fork of the Entiat. Off-road recreational vehicles should be kept in minimum conflict areas. I do not appreciate the roar of trailbikes when I am hiking in our national forests.
 
 
 40
 (A.R. 42 at 3573.) These comments, and many more like them in the Administrative Record, illustrate the views of a significant number of national forest users who feel that the use of forest trails by ORVs significantly interferes with their use and enjoyment of those same trails.
 
 
 41
 As a result of the outpouring of public sentiment concerning the alleged conflicts between hikers and ORV users, the Defendants established an Interdisciplinary Team to analyze ORV use in the Wenatchee National Forest. The primary responsibility of the Interdisciplinary Team was to scrutinize the trail system available to ORV users and hikers, study the overlapping interests, and formulate proposals to reduce conflict and address problems identified in the public comments. (A.R. 32 Attachment K at K-86.) "The results of this analysis and the concurrent evaluation of unroaded areas were merged to form the management direction and unroaded area allocation described in the alternatives in the [final] EIS." Id. Based on the Interdisciplinary Team's efforts, it was determined that "[t]he most significant opportunity to reduce conflict through the Forest Plan is in allocation of unroaded areas into either RE-2a and 2b, Unroaded Motorized, or RE-3, Unroaded Non-Motorized.... This allocation provides for separation of users on an area basis in some of the more controversial areas." (A.R. 32 Appendix K at page K-86.)
 
 
 42
 The Interdisciplinary Team specifically developed several alternatives for the recreational use of the North Entiat area. (A.R. 66.) The alternative adopted by the Defendants, and the one incorporated into the Plan, designated the North Entiat as a semi-primitive, non-motorized area. (A.R. 5 at 19.) One of the reasons the Team adopted this designation was to reduce the conflicts between hikers and motorbikers. (A.R. 66.)
 
 
 43
 Further evidence of "user conflict" is contained in the Administrative Record at Item 94. This "White Paper on Status of Motorized Trails; Past-Present-Future," provides the following with respect to conflicts in the North Entiat area:
 
 
 44
 This trail system has 51.4 miles of trails.... The trail system is popular with the trailbike users. There are two trails that do have conflicts [sic] with other users. They are North Fork Entiat # 1400. This trail is the main entry into the Glacier Peak Wilderness.... The other trail is # 1433-1441 to Pyramid Mt., [it] has had conflicts in the past with the users going on a closed portion of trail 1441.
 
 
 45
 (A.R. 94.)
 
 
 46
 Based on the foregoing, the Forest Service concluded that "user conflict" exists in the North Entiat area, and in order to fulfill its obligation to reduce such conflict, the Forest Service decided to close the North Entiat area to ORV use. The Plaintiff claims that this decision was arbitrary and capricious.
 
 
 47
 First, the Plaintiff contends that insofar as the "user conflict" determination was based on the experience of Forest Service personnel, it was arbitrary and capricious because the Administrative Record contains no information on the specific "experience" of Forest Service personnel. In their briefs, neither the Defendants nor the Intervenors point to any place in the Administrative Record that indicates what events Forest Service personnel experienced that would justify a conclusion that "user conflict" existed in the North Entiat area. Further, when questioned about this during argument, the Defendants were unable to point to any place in the Administrative Record that specifically indicated what the personal experiences of the Forest Service personnel referred to in the Plan were. The Defendants do assert that the results of the Interdisciplinary Team's study were, in part, based on the experiences of Forest Service personnel. However, the Defendants have not cited, nor has the court found, any direct statements from the Interdisciplinary Team that illustrate the personal experiences of Forest Service employees. If this court were only to consider the experiences of the Forest Service personnel, the court would have a difficult time upholding the Defendants' decision to designate the North Entiat RE-3; however, this was not the only basis for the Defendants' decision. In fact, it appears that the public comments received by the Defendants were the primary basis for the Defendants' finding of "user conflict" in the North Entiat area, not the experience of Forest Service personnel. However, the Plaintiff also argues that the public comments do not justify the Defendants' decision.
 
 
 48
 The Plaintiff asserts that most of the comments expressed the author's opposition to ORV use generally, and those that did discuss conflicts did so only in vague terms. Further, the Plaintiff urges the court to disregard the public comments because they were made by "interested" persons. The Plaintiff claims that none of the comments were independently verified by the Defendants, and even though the Defendants acknowledged that monitoring of conflicts was necessary, no monitoring ever took place. (A.R. 78.)
 
 
 49
 The Plaintiff strenuously contends that the comments made should be disregarded because the individuals are interested parties and their comments were unverifiable. The Plaintiff would have the Defendants attempt to somehow objectively quantify the extent of conflict. Citing Mobil Oil Corp. v. Federal Power Comm'n, 483 F.2d 1238, 1260 (D.C.Cir.1973), the Plaintiff argues that informal comments, like the ones offered in this case, cannot justify the Defendants' decision because it is the process of testing and illumination that is a necessary part of reasoned decision making. Mobil Oil, however, dealt with an agency setting rates for the transportation of liquid hydrocarbons. This endeavor is quite a bit different than the Defendants' task in this case, for rates are quantifiable and can be objectively analyzed and tested, whereas "user conflict" has a significant subjective element to it. In this respect, Mobil Oil and the other cases cited by the Plaintiff in attempt to discredit the use of informal public comment to determine the existence of "user conflict" are distinguishable.
 
 
 50
 Individual comment is a very persuasive indicator of "user conflict," for determining the existence of conflicts between humans cannot be numerically calculated or counted; rather, the existence of conflict must be evaluated. The court can envision no better way to determine the existence of actual past or likely future conflict between two user groups than to hear from members of those groups.
 
 
 51
 The Plaintiff also argues that the public comments did not directly discuss "user conflict" in the North Entiat; rather, the Plaintiff asserts that they just discussed a general dislike to ORVs. It is true that a majority of the public comments did not specifically state that ORV use "conflicts" with non-motorized uses and that many of the comments focused on the philosophical aversion many people hold toward ORV use; however, the intent of the comments is clear. In the minds of the individuals who commented on the issue, the noise, dust, trail damage, exhaust, and safety concerns caused by ORV use significantly reduces, or eliminates, the experience they seek while in the forest. (A.R. 43.) Though not phrased as such by the authors of the comments, the court finds that the comments indicated that a general "conflict" exists between the two user groups in the Wenatchee National Forest, including the North Entiat area.
 
 
 52
 Further, the Plaintiff's contention that the public comments are unverifiable does not mandate a finding that the Defendants' decision was arbitrary and capricious. The Plaintiff has offered, and the court has found, no statute or regulation that required the Defendants to independently verify public comments made in connection with the proposed plan for the Wenatchee National Forest. As the fact-finder in this case, the Defendants were in the best position to determine the credibility of the comments offered by the public establishing the existence of "user conflict" in the North Entiat. Sitting as an appellate court in this matter, the court will not reverse the Defendants' implicit determination that the public comments accurately portrayed the thoughts and beliefs of the authors.
 
 
 53
 Plaintiff also points to Forest Supervisor O'Neal's October 3, 1988 letter where he stated that "monitoring efforts by the Entiat Ranger District personnel have been sketchy to date because of a lack of adequate personnel to do the monitoring." (A.R. 43.) The Plaintiff argues that this illustrates the Defendants' failure to verify the existence of "user conflict" in the North Entiat. However, the Plaintiff has pointed to no statute or regulation which mandates monitoring before implementation of a Land and Resource Management Plan. Regulations do require monitoring in order to review the management direction of the Plan and to ensure that the Plan is meeting its goal of protecting the productivity of the land and environmental values. See 36 C.F.R. Sec. 219.12(k) and 36 C.F.R. Sec. 219.10(f). This ongoing monitoring is required because the Plan is reviewed annually and can be amended. 16 U.S.C. Sec. 1604(f)(4). However, the court finds that the Forest Service was under no obligation to perform physical monitoring of "user conflict" before the Plan was completed. Consequently, the court finds that even if the Defendants failed to adequately monitor the North Entiat area for actual "user conflicts," this failure would not render their decision to close the North Entiat area to ORVs arbitrary and capricious.
 
 
 54
 The Plaintiff further contends that the Defendants failed to establish that actual conflicts existed in the North Entiat area. The Plaintiff again points to the October 3, 1988 letter by Forest Supervisor Sonny J. O'Neal, written after the decision to close the North Entiat area was made, which stated that based on the monitoring conducted to date, "no on-the-ground conflicts between users have been documented in the area." (A.R. 43.) The court might be persuaded by the Plaintiff's argument if the Defendants were instructed to minimize actual conflicts; however, this is not the case.
 
 
 55
 36 C.F.R. Sec. 295.2(a) provides that if the Forest Service's analysis underlying its land management plan indicates that the use of ORVs will cause considerable adverse effects, use of the type of ORV likely to cause such adverse effects will be restricted or prohibited. Taken in its entirety, section 295.2(a) commands the Forest Service to restrict ORV use when there is a future likelihood that considerable adverse effects would result from ORV use. Given the fact that the words "will" and "likely" were used in section 295.2(a), it cannot be said that the regulation requires evidence of past actual conflicts before use restrictions can be imposed. If it was intended that ORV restrictions be imposed only after actual conflict occurred, appropriate language would have been used to so specify. In other words, it the regulation was only intended to trigger ORV use restrictions when conflicts had actually occurred, the wording of section 295.2(a) would likely read "[i]f the analysis indicates that the use of one or more vehicle types off roads has caused...." instead of "[i]f the analysis indicates that the use of one or more vehicle types off roads will cause...." Further, 36 C.F.R. Sec. 295.2(b), which discusses the Forest Service's charge to minimize "user conflict" when developing ORV use plans, does not require that actual conflicts exist before restrictions on ORV use can be imposed. In fact, the language of section 295.2(b)(3) suggests just the contrary: "Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands...." (Emphasis added.) By directing the Forest Service to minimize conflicts between ORVs and proposed recreational uses, the regulation must be read as contemplating likely future conflicts because there can be no actual conflict with a proposed activity.
 
 
 56
 Under the codification of the applicable Executive Order, the court concludes that the Defendants were charged to minimize likely future conflicts between forest users. The Executive Order does not require a factual recitation of actual confrontations. If the Plaintiff's position was accepted, the Forest Service would only have to restrict ORV use if actual physical altercations between two user groups occurred. In light of the Executive Order and 36 C.F.R. Sec. 295.2, the court rejects the argument that the Forest Service's role in minimizing user conflicts is strictly reactive. The Executive Order, and its codification, must be read as inherently granting the Forest Service authority to prevent physical confrontations and to execute its planning and land management authority in a preemptive manner. The court determines that by anticipating confrontations and enacting appropriate regulations to prevent them, the Defendants honor the intent and spirit of the Executive Order and 36 C.F.R. Sec. 295.2.
 
 
 57
 Finally, the Plaintiff, during argument, stated that the Forest Supervisor sent a letter to Representative Chandler claiming that no "user conflict" existed in the North Entiat. However, a review of two letters sent by the Forest Service indicates that Representative Chandler was told that "user conflict" existed. In a letter dated December 1, 1986, Forest Supervisor Donald H. Smith informed Representative Chandler that "Entiat and Nacnes Ranger Districts are the only ones that had documented conflicts [between motorized and non-motorized users]. These consist of 12 letters that have been received indicating various degrees of conflict." (A.R. 91.) Moreover, in a June 9, 1987 letter, Acting Forest Service Supervisor Gerald G. Heath told Representative Chandler that "[s]ince the Wenatchee Forest has more trail use than any other National Forest in the state, and more trailbike use than all the other forests combined, it seems logical that there is more potential for conflict here than elsewhere. Yet the reports of actual conflicts received by our Ranger Districts are very few." (A.R. 82.) These letters directly contradict the Plaintiff's assertion that Representative Chandler was told that no "user conflict" existed in the Wenatchee National Forest, including the North Entiat.
 
 
 58
 In sum, the court finds that the issue of ORV use in the North Entiat area poses a philosophical struggle occasioned by incompatible desires and aims between ORV users and non-motorized trail users. The Defendants rationally found that ORV users and other non-motorized trail users were, or were likely to be, in "conflict" with one another in the North Entiat area. Moreover, the court finds sufficient evidence in the record that the Defendants' designation of the North Entiat area as semi-primitive, non-motorized, was for the protection of the resources on the land, as well as to ensure the safety of all land users. The court finds that the evidence considered by the Defendants, including reliance on user comments, Forest Service personnel professional judgment, and the findings of the Interdisciplinary Team, provided them with a rational and ample basis for its decision to close the North Entiat area to ORV use. The court determines that the Defendants considered all relevant factors, including the actual and likely future "conflict" between ORV users and hikers, in rendering its decision, and that decision did not amount to a clear error of judgment. Consequently, the court finds that the decision to close the North Entiat area to ORV use was not arbitrary and capricious, in violation of the Administrative Procedures Act.
 
 
 59
 2. Defendants' Decision to Close the North Entiat Area to ORVs is Supported by a Reasonable Explanation
 
 
 60
 As stated previously, an agency must articulate a satisfactory explanation for its action. There must be a rational connection between the facts found and the choices made. Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983). The agency's explanation must be sufficient to permit effective judicial review, see S.E.C. v. Chenery Corp., 332 U.S. 194, 196-97, 67 S.Ct. 1575, 1577-78, 91 L.Ed. 1995 (1947), and the reviewing court should not attempt to make up for deficiencies in the agency's decision. Motor Vehicle Manufacturers, 463 U.S. at 43, 103 S.Ct. at 2866-67. A court "may not supply a reasoned basis for the agency's action that the agency itself has not given." Id. However, a court can uphold an agency decision "of less than ideal clarity if the agency's path may reasonably be discerned." Id.
 
 
 61
 In the case at bar, the Plaintiff contends that the Defendants did not set forth a satisfactory explanation for their conclusion that "user conflict" required the closure of the North Entiat area to ORV use. The essence of the Plaintiff's argument is that the Defendants failed to articulate a connection between the facts found and their conclusion that ORV use conflicted with non-motorized uses. Although not a model of clarity, the court finds that it can discern the Defendants' decision-making path from the Administrative Record, and concludes that there exists in the record a satisfactory explanation for the Defendants' decision.
 
 
 62
 The rationale for closing the North Entiat area to ORV use is contained in the Plan's "Record of Decision." (A.R. 30.) The Record of Decision states that conflicts between recreational users, including hikers and ORV users, are becoming more common. The Record of Decision goes on to state that:
 
 
 63
 [b]etween the draft and final, the Forest initiated an intensive analysis of trail management, including semi-primitive motorized and non-motorized recreation opportunities, on the entire Forest, District by District, based on public comments to the [draft EIS] and personal experience of professionals. The main purpose of the analysis was to find the proper balance between motorized and non-motorized trails for the Forest.
 
 
 64
 Id. at 21 (emphasis added). The Record of Decision also provides that the decision to prohibit ORV use in the North Entiat area, along with other aspects of the Plan, will "provide a proper balance of trail opportunities between motorized and non-motorized users and, hence, reduce the potential for conflict." Id. (emphasis added).
 
 
 65
 Further, the final EIS states that the Defendants had received extensive comments expressing high levels of concern about conflicts between ORV users and hikers. According to Sonny J. O'Neal, Wenatchee National Forest Supervisor: "Most complaints were from hikers, and some mentioned noise, exhaust, dust, interruptions, and safety as the main source of conflict." (A.R. 43.) To address the concerns raised by these comments, an Interdisciplinary Team was formed. The Interdisciplinary Team's analysis was merged with the Defendants' evaluation of the unroaded areas and the public's comments to arrive at an allocation of trail miles available for different uses, including hiking and motorized use. (A.R. 32 Appendix K at page K-86.) According to the final EIS, "[t]hese allocations were made in an effort to provide opportunities for motorized use and hiking in a variety of settings. They also seek to match the designated use to the other resource values of the immediate areas and reduce user conflicts." Id. at K-87.
 
 
 66
 As mentioned previously, the Interdisciplinary Team developed several alternative plans to address the ORV/hiker conflict. The alternative that was eventually incorporated into the final Plan called for closure of the North Entiat area to ORV use. In its analysis of each alternative, the Interdisciplinary Team listed the "pros" and "cons" of each alternative. What follows are the "pros" and "cons" of the preferred alternative:
 
 
 67
 Pro--Reduce overall reconstruction costs.... Provide contiguous area outside Wilderness for nonmotorized trail experience. Reduces conflicts between hikers and motorbikers. Make law enforcement easier. Does not effect the agreement with I.A.C. Adds protection of Wilderness from motorized use violations. Con--Alienates a User Group. Restricts motorized use to fewer trail miles--Causing greater impacts on the remaining trails. Eliminates a reasonable access by motor bikes to a destination spot (Fern Lake.) Gives hiker/horse group exclusive use of North Fork area and they can still share Mad River area.
 
 
 68
 (A.R. 66) (emphasis added).
 
 
 69
 The Plaintiff's contention that the Defendants failed to articulate any connection between "facts found" and their conclusion that ORV use "conflicted" with non-motorized uses in the North Entiat is without merit. In the excerpts from the Administrative Record cited above, the Defendants clearly state that based on public comments, professional experience, and the analysis of the Interdisciplinary Team, non-motorized trail users' enjoyment of the North Entiat area of the Wenatchee National Forest was hindered by the presence of ORVs. The Defendants concluded that this hinderance was a sufficient "conflict" to justify the closing of the North Entiat area to ORV use. In other words, the Defendants "found" that the noise, dust, trail damage, exhaust, and safety concerns caused by ORV use in the North Entiat area "conflicted" with non-motorized trail use by reducing the enjoyment experienced by non-motorized trail users in the North Entiat area. (A.R. 43.) This articulation is sufficient for this court to execute effective judicial review, and in so doing, the court finds that there was a rational relationship between the facts found by the Defendants and the closing of the North Entiat area to ORV users.[3] Further, the court finds that the Defendants' desire to provide a proper balance of trail opportunities between motorized and non-motorized users and to reduce "user conflict" was a reasoned basis for the Defendants' decision to close the North Entiat area to ORV use.
 
 
 70
 During argument, the Plaintiff asserted that because the Defendants had historically allowed ORV use in the North Entiat area, they had to support ORV use restriction in the North Entiat with a greater justification than would have been necessary if no ORV use had ever been permitted in the area. In support of its position, the Plaintiff cites Motor Vehicle Manufacturers, 463 U.S. at 42, 103 S.Ct. at 2866, where the Supreme Court stated that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." The Plaintiff argues that this "reasoned analysis" must explain why the agency chose to deviate from prior policy.
 
 
 71
 The court disagrees that the Defendants in this case changed their policy. Rather, they modified a "plan" to further an existing policy, which is to minimize user conflict. Further, the cases cited by Plaintiff prohibit policy changes without a principled reason to do so. Even if the closure of the North Entiat was viewed as a policy change, it was, as discussed supra, based on a rational and principled reason: to minimize "user conflicts" in the North Entiat.
 
 
 72
 B. The Plan Did Not Create a "Buffer Zone" Around a Wilderness Area in Violation of the Washington State Wilderness Act of 1984
 
 
 73
 The Plaintiff's position is that the Washington State Wilderness Act of 1984 explicitly bars the creation of buffer zones around Wilderness areas. The Plaintiff contends that the Defendants eliminated ORV use in the North Entiat area, in part, to buffer the adjacent Glacier Wilderness Area ("Glacier") from the possibility of negative impacts caused by ORV use. The Plaintiff asserts that the Plan creates a de facto buffer zone around Glacier.
 
 
 74
 Section 9 of the Washington State Wilderness Act of 1984 [the Wilderness Act] provides:
 
 
 75
 Congress does not intend that designation of wilderness areas in the State of Washington lead to the creation of protective perimeters or buffer zones around each wilderness area. The fact that non-wilderness activities or uses can be seen or heard from areas within the wilderness shall not, of itself, preclude such activities or uses up to the boundary of the wilderness area.
 
 
 76
 P.L. 98-339, Sec. 9, 98 Stat. 299, 305 (1984).
 
 
 77
 An unambiguous statute must be applied according to its plain meaning. Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). The Plaintiff contends that the Wilderness Act is unambiguous and strenuously argues that the "plain language" of the Wilderness Act bars all buffer zones and protective perimeters around Wilderness areas, without exception.
 
 
 78
 The Defendants contend that section 9 of the Wilderness Act does not require buffer zones around Wilderness areas. This reading of the Wilderness Act is a reasonable one it the second sentence of section 9 is ignored. However, when section 9 is considered in total, it is clear that Congress intended that protected zones around Wilderness areas cannot be created if the only reason for their existence is to protect the Wilderness area from the effects of uses on adjoining nonwilderness lands. In this respect, the Plaintiff is correct that the Wilderness Act prohibits buffer zones around Wilderness areas. This conclusion, however, does not necessitate reversing the Defendants' decision in this case.
 
 
 79
 To the extent an activity is prohibited on land adjacent to a Wilderness area solely because of its potential effect on the Wilderness area, the prohibition would likely violate the Wilderness Act's prohibition of buffer zones. However, if an activity is prohibited, in part, for reasons other than the possible effect that activity will have on an adjoining Wilderness area, it is not an impermissible buffer zone under the Wilderness Act. The Wilderness Act clearly prohibits use restrictions on nonwilderness areas based solely on the potential impact that use might have on the Wilderness. Congress' intent on this point is manifested through its express language in section 9 of the Wilderness Act: "The fact that nonwilderness activities or uses can be seen or heard from areas within the wilderness shall not, of itself, preclude such activities or uses up to the boundary of the wilderness area." (Emphasis added.) When Congress used the words "of itself," it implicitly stated that the effects on a Wilderness area can be considered when allocating uses of adjoining nonwilderness area, so long as it is not the only reason. Therefore, contrary to the Plaintiff's position, the Wilderness Act does not prevent the Forest Service from considering the Wilderness classification of adjoining land as a factor in developing the Land and Resource Management Plan for the non-wilderness area.
 
 
 80
 The Plaintiff, in its Reply Brief, argues that the Wilderness Act places just one limit on the Defendants' authority to impose use restrictions on the North Entiat: the Defendants may not eliminate a nonwilderness multiple use, like ORVs, in order to insulate a Wilderness area from that use. The Plaintiff is correct insofar as it states that the Defendants could not have properly prohibited ORV use in the North Entiat area solely because of the potential effect such use would have on Glacier. However, the Plaintiff is incorrect to the extent it argues that the Defendants could not have permissibly considered the impact of ORV use in the North Entiat on Glacier as a factor in their Land and Resource Management Plan. As discussed above, the primary reason ORVs were precluded from the North Entiat area was to reduce "user conflicts." The fact that this determination was additionally based on other factors, including the proximity of the North Entiat area to Glacier, does not invalidate it.
 
 
 81
 The Plaintiff argues that if this court allows the Defendants' Plan to stand, "it would allow the Forest Service to buffer designated wilderness by barring nonwilderness multiple uses from nearby zones without fear of judicial reversal." (Ct.Rec. 45 at page 17.) It is true that the Defendants in this case have barred ORV use in land adjoining a Wilderness area. However, contrary to the Plaintiff's assertion, this was not done without judicial review. The court has already found that the Defendants' decision was not arbitrary and capricious based, in part, on its determination that "user conflicts" existed in the North Entiat area. This finding ends the buffer zone inquiry under the Wilderness Act, for it establishes that a protective zone was not created solely to protect a Wilderness area from the effects of uses on adjoining nonwilderness land.
 
 V. CONCLUSION
 
 82
 The court determines that the Defendants' decision to prohibit ORV use in the North Entiat area based primarily on the existence of actual and/or likely future "user conflict" in the area was not arbitrary or capricious. Further, the court finds that the designation of the North Entiat area as RE-3, Dispersed Recreation, Unroaded, Non-Motorized, was not created solely as a buffer zone around Glacier Peaks Wilderness in violation of the Washington State Wilderness Act of 1984. Consequently, because there exist no genuine issues of material fact and the Defendants and Intervenors are entitled to judgment as a matter of law, the Defendants' and Intervenors' cross-motions for summary judgment should be granted.
 
 IT IS HEREBY ORDERED:
 
 83
 1. The Plaintiff's Motion for Summary Judgment (Ct.Rec. 44) IS DENIED.
 
 
 84
 2. The Defendants' Cross-Motion for Summary Judgment (Ct.Rec. 36), and the Intervenor's Cross-Motion for Summary Judgment (Ct.Rec. 39) ARE GRANTED and the Complaint shall be DISMISSED WITH PREJUDICE.
 
 
 85
 IT IS SO ORDERED. The Clerk is hereby directed to enter this Order, furnish copies to counsel, and close the file.
 
 
 86
 DATED this 7th day of August 1992.
 
 
 
 *
 The Honorable Michael Espy is substituted for his predecessor, The Honorable Edward Madigan, as Secretary of the U.S. Department of Agriculture. Fed.R.App.P. 43(c)(1)
 
 
 **
 Honorable Thomas M. Reavley, Senior Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 The Defendants' obligation referred to by the non-motorized trail users is contained in 36 C.F.R. Sec. 295.2(a). 1: "If the analysis indicates that the use of one or more vehicle types off roads will cause considerable adverse effects on the resources of other forest visitors, use of the affected areas and trails by the vehicle type or types likely to cause such adverse effects will be restricted or prohibited...."
 
 
 [2]
 The Plaintiff claims that its organization would have offered more letters in support of its position, but the Defendants had earlier represented that the quality of ideas was more important than the quantity. Apparently, therefore, the Plaintiff's members did not send as many comments in on this issue as they could have
 The fact that the Plaintiff's organization did not publish as many letters in support of its position as it could possibly have does not alter the court's finding in this case. The court here is reviewing the evidence only to determine whether such evidence existed that justified the Defendants' decision. Because the court finds that the Defendants could have rationally based their decision on the comments made, the court concludes that additional comments made to the contrary by the Plaintiff's members would have only gone to the weight of the evidence and, therefore, would not have altered this court's judgment.
 
 
 [3]
 In its Response brief, the Plaintiff alleges that the decision to close the North Entiat area to ORV use was based on political pressure. The Plaintiff supports its contention by referring to Representative Chandler's letter to the Defendants regarding "user conflict." In that letter, Representative Chandler stated that he received over 500 letters from individuals who consider it a conflict for non-motorized trail users and ORV users to be using the same trails. The Plaintiff claims that this "pressure" resulted in an improper motivation to close the North Entiat area to ORV use. This court cannot conclude that the Defendants' decision to prohibit ORV use in the North Entiat area was arbitrary and capricious because a Congressman conveyed his constituents' views on "user conflict" to the Forest Service. What the Plaintiff refers to as "political pressure" is how the individual voice is heard in our form of government. By forwarding letters of concern to the Forest Service, Representative Chandler was not applying "political pressure," he was fulfilling his sworn obligation to his constituents