**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 14, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

E. DEAN JAGERS; TOM JACOBS;
STANLEY KRIEGER; MATT
ROSENGRANTS; SAND ARROYO
RANCH, INC.,

        Plaintiffs - Appellants,

  and

GLEN R. AUSMUS; RUSSELL L.
AUSMUS,

        Plaintiffs,

v.

FEDERAL CROP INSURANCE
CORPORATION,

        Defendant - Appellee.

No. 12-1342

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:10-CV-00956-RPM)**

---

Jeff L. Todd (Jeremiah L. Buettner with him on the briefs) of McAfee & Taft, Oklahoma City, Oklahoma, for Plaintiffs - Appellants.

Michael C. Johnson, Assistant United States Attorney (John F. Walsh, United States Attorney, with him on the brief), Denver, Colorado, for Defendant - Appellee.

Before **KELLY, McKAY,** and **MATHESON,** Circuit Judges.

**McKAY**, Circuit Judge.

In this appeal, we consider whether Appellee Federal Crop Insurance Corporation acted arbitrarily or capriciously in denying federal crop insurance coverage for corn that Appellants planted in 2008 on newly broken, non-irrigated acreage in Baca County, Colorado. The agency determined that coverage should be denied because Appellants failed to follow good farming practices by planting on this newly broken land without first allowing a fallow period. After they each received an unfavorable good farming practices determination, Appellants filed the instant action in the district court. The district court affirmed the agency's unfavorable GFP determinations as to Appellants, and this appeal followed.[1]

**I.**

Appellants are five farmers who planted corn on newly broken, non-irrigated acreage in Baca County, Colorado, in the spring of 2008. Some of this land had

---

[1] There were two other plaintiffs involved in the proceedings below, but, unlike Appellants, their negative GFP determination was not based on planting on newly broken land. Rather, the agency issued an unfavorable GFP determination against them because they did not apply any fertilizer to their corn acreage, which the plaintiffs explained was due to the fact that their corn crop did not emerge in the first place as a result of the severe drought in 2008. The district court held that the agency's negative GFP determination as to these plaintiffs was arbitrary and capricious and accordingly granted relief to these plaintiffs. Their claims are not at issue in this appeal.

previously been subject to the USDA Conservation Reserve Program, while other land had previously been utilized for a grass crop. Before planting corn on this newly broken land, Appellants each applied for Group Risk Income Protection coverage.

Under the Federal Crop Insurance Act, GRIP policies are issued by private insurance companies approved by the Federal Crop Insurance Corporation. These Approved Insurance Providers are reinsured by the FCIC, which is thus the indemnitor for any covered losses. In this case, Heartland Crop Insurance was the AIP for Appellants E. Dean Jagers, Matt Rosengrants, and Sand Arroyo Ranch, while Agro National Incorporated Insurance Company was the AIP for Appellants Tom Jacobs and Stanley Krieger.

Under a GRIP policy, the insured is indemnified if the county average per-acre revenue for the insured crop falls below the insured's trigger revenue. This trigger revenue is determined by multiplying the expected county revenue by the insured's chosen coverage level, with the expected county revenue being determined based on expected prices and historical county average yields published by the National Agricultural Statistics Service. Some GRIP crop insurance policies—"specified practice" policies—specify whether the insured crop must be produced by irrigated or non-irrigated practices, and the expected county yield is based on NASS production data for the specified practice. However, the GRIP policies for Baca County in 2008 were "no practice specified" policies, which do not limit the production method and which calculate the expected county yield based on a blended yield of total county production

for both irrigated and non-irrigated practices.

As required by the applicable statute and regulations, Appellants' GRIP policies provided that the insurer would not insure any acreage where the insured had failed to follow "good farming practices," which are defined as "[t]he production methods utilized to produce the insured crop and allow it to make normal progress toward maturity, which are . . . for conventional or sustainable farming practices, those generally recognized by agricultural experts for the area." (Appellants' App. at 69.)

In May 2008, the Risk Management Agency—the agency tasked with supervising the FCIC and administering all programs authorized under the Federal Crop Insurance Act—received an email from an AIP agent which stated in part:

> It has come to my attention that some farmers in Baca County Colorado think they have a way to milk crop insurance out of a fortune using the GRIP program for corn in their county. . . . The rumor is that they are breaking out pasture land and intending to insure it on the first year it is cultivated.

(Appellee's Supplemental App. at 263.) An RMA representative responded:

> Thanks for the information. We're looking in to [sic] this and other counties that may have similar GRP issues and are planning to make some changes for the 2009 crop year. Although the GRIP policy does not have the new breaking provisions of [other types of policies, it] does contain a requirement that good farming practices be followed. I'm attaching a memo that was recently issued reminding Insurance Companies of this requirement. Thanks again for the information. I am going to pass this along to others in the agency.

(*Id.*)

Various RMA employees discussed this potential problem in several internal

emails sent in May 2008. One RMA official discussed sending someone from the regional office to visit Baca County "to ground truth the rumors[, c]apture what is going on in the area[,] visit with FSA, Extension but also include the AIP so they can take control." (Appellants' App. at 293.) She stated that the GFP provisions of the GRIP policies seemed to be "the only way to manage this" for 2008, but she suggested that they "push to either remove the [non-irrigated] practice or make other policy changes to minimize these 'opportunities'" in the future. (*Id.* at 294.) In response, another RMA employee stated:

> [P]lease don't pressure us to support a decision of failure to follow a good farming practice on producers across the board this year. We do have a nonirrigated practice for corn for [actual production history] purposes in this county. . . . A blanket good farming determination is no way to handle this issue.

(*Id.* at 293.) A third RMA employee then stated: "I agree that GFP decisions must be made on an individual basis. However, we must assess the conditions at planting and the growing season to determine the necessary man[a]gement practices so that those individual decisions can be made." (*Id.* at 290.)

In accordance with this conclusion, the RMA mailed letters to the AIPS in June 2008 stating:

> The RMA Topeka Regional Office has alerted the [Central Regional Compliance Office of the RMA] of program abuse concerns in Baca County, Colorado. It is alleged large tracts of land are being sold and broken out of pasture/rangeland, planted to dry land corn, and insured under the corn GRP/GRIP plan of insurance. In addition, allegations that the producers are not following good farming practices have been reported.

-5-

. . . .

> Based on our analysis, to date, and the number of calls regarding
> specific program abuse concerns, we have determined and confirmed there
> is sufficient evidence to warrant a monitoring program of the 2008 crop
> year GRP/GRIP corn policies in Baca County, Colorado.

(*Id.* at 231-32.) The letter then advised the AIPS that they were required to conduct 2008 crop year reviews and growing season inspections in order to determine whether the approved procedures and policies, including good farming practices, were being followed.

In addition, the RMA began researching good farming practices for non-irrigated corn production in Baca County, Colorado, and specifically as this related to corn production on newly broken land. The RMA collected the results of its research in a document entitled "Useful documentation for Good Farming Practice in Baca County—Non-Irrigated C[or]n Production in 'No-Practice Specified' Grip County." (Appellee's Supplemental App. at 245.) This document began: "Researching the conversion of New Breaking, rangeland and CRP land to cropland in eastern Colorado and western Kansas, the Topeka [Regional Office] identified the following supporting documentation that insure[r]s may find useful in making good farming practice decisions." (*Id.*) The document then summarized and quoted from various sources discussing dryland corn production in western Kansas and eastern Colorado, where Baca County is located. For instance, the document noted that "a study conducted at Tribune, Kansas was carried out under similar soil and climate conditions," and "[a]ll studies

-6-

included the use of a fallow period between the termination of plant growth and planting of a crop." (*Id.* at 247.) The report on this study stated that "'Sufficient time should be allowed between the destruction of CRP grasses and planting of the first crop to allow accumulation of soil moisture,'" and the writers further observed that "'soil water is depleted by CRP grasses, and a f[a]llow period to store soil water will be necessary prior to crop planting.'" (*Id.* at 248 (italics omitted).) The RMA document also included a quote from an email sent to the RMA by a Colorado extension agent, who stated: "'There is no drier soil than that which has been in native or CRP Sod. If you're farming dryland don't expect a crop this calendar year unless you get a huge amount of spring moisture (5" or so).'" (*Id.* (italics omitted).) Other sources quoted in the document discussed corn's water needs and the problems with converting former rangeland and CRP land to cropland. An agronomist at Kansas State University reviewed the information the RMA had collected and stated the information "seem[ed] reasonable to [him]." (*Id.* at 262.)

In early May, around the same time the RMA received the AIP agent's email about potential program abuses, the Office of the Inspector General of the USDA began reviewing the effects of blended yields on no-practice-specified GRIP policies. The OIG Audit Report, issued on March 4, 2009, focused on the OIG's audit of the Baca County program, and concluded that the use of a no-practice-specified GRIP policy was problematic. The OIG stated that "because of extreme drought conditions" in Baca County in 2008, "there would be minimal production from [all] non-irrigated corn acres," and thus the OIG was "unable to make a determination as to whether good farming

practices were actually being carried out." (Appellants' App. at 305.) The OIG report recommended, among other things, that the RMA stop using no-practice-specified policies in the future. The RMA concurred with this recommendation and reported it had discontinued no-practice-specified GRIP coverage "effective for the 2009 and succeeding crop years." (*Id.* at 308.)

In April 2009, Heartland informed the three Appellants it insured that it had made GFP determinations as to their 2008 Baca County corn crops. Heartland stated that all of Appellants' acreage was ineligible for insurance coverage because Appellants failed to follow good farming practices by (1) planting corn on newly broken lands without a fallow period, and (2) failing to apply sufficient fertilizer. In accordance with the applicable agency procedures, Appellants requested the RMA to review Heartland's GFP determinations. For each of the three Heartland Appellants, the RMA affirmed the AIP's GFP determination as to the newly broken land but overturned Heartland's determination as to the fertilization question. In accordance with this conclusion, the RMA restored insurance coverage for more than fifty percent of each Appellant's acreage.

As for the two Appellants insured by Agro, their AIP notified them it could not make a GFP determination. In accordance with the applicable agency policies, Agro requested the RMA to make the GFP determination instead. For both Agro Appellants, the RMA considered the documentation provided by Agro, the results of their growing season inspections, generally recognized published material, and the documentation provided by Appellants to support their claim that they followed generally recognized

good farming practices. The agency then concluded that Appellants failed to follow good farming practices by planting non-irrigated corn on acreage newly broken out of native vegetation, rangeland, or CRP. Thus, the RMA concluded that Appellant Tom Jacobs was not entitled to coverage for the non-irrigated corn he planted on 522.9 acres of newly broken land but was entitled to coverage for the remaining 7996.8 acres where he followed good farming practices. Similarly, the RMA concluded that Appellant Stanley Krieger was not entitled to coverage for corn he planted on 249.63 acres of newly broken land but was entitled to coverage for the remaining 800.67 acres of corn he had planted.

The record indicates that Appellants were all refunded the premiums they paid for the newly broken lands that the agency excluded from coverage based on its GFP determinations.

Appellants sought judicial review of the agency's partially unfavorable GFP determination as to each Appellant. The district court affirmed the agency's decision, and this appeal followed. On appeal, Appellants do not debate the merits of the agency's determination that planting non-irrigated corn on newly broken land without a fallow period is not a good farming practice. Rather, Appellants simply argue that we should overturn the agency's determination as arbitrary and capricious because (1) the agency predetermined this result and made its decision based on bias and other improper motivations, and (2) the agency failed to follow its own procedures relating to the issuance of GFP determinations.

## II.

We review the district court's decision de novo but review the underlying agency decision under the deferential Administrative Procedures Act standard of review, under which "[w]e confine our review to ascertaining whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made." *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006). "In reviewing the agency's explanation, we must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Id.* "Agency action will be set aside if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (internal quotation marks omitted). "It is not our duty, however, to substitute our judgment for that of the agency's on matters within its expertise," and "[t]he scope of our review . . . is narrow." *Id.*

We first consider Appellants' argument that the agency's negative GFP determination should be overturned because the agency's conclusions were predetermined and were based on bias and other improper motivations. Appellants argue the agency's determination that Appellants failed to follow good farming practices by planting non-irrigated corn on newly broken land "was pretextual, and was motivated by the fact that it had erroneously designed the [GRIP] policy to dramatically over-insure

non-irrigated corn acres in [Appellants'] county, which, in turn, made it the target of an OIG investigation and critical report." (Appellants' Opening Br. at 2.) Specifically, Appellants argue the agency's GFP determination should be overturned as arbitrary and capricious because (1) "issuance of the GFP Determinations at issue was predetermined" as early as June 2008 (*id.* at 18); (2) the RMA was biased in favor of minimizing the number of non-irrigated acres that would receive insurance coverage; (3) the RMA "was motivated by its own pecuniary interests" to limit its own insurance liability (*id.* at 28); (4) the RMA was also motivated by "political pressures, i.e., the OIG's sharp criticism of RMA for its mistake in over-insuring non-irrigated corn acres in Baca County" (*id.* at 29); and (5) the agency's consideration of these improper financial and pecuniary motivations proves that the agency acted in bad faith and violated Appellants' due process rights.

We are not persuaded by any of these arguments. First, the record does not support Appellants' assertion that the negative GFP determination was predetermined. At most, the materials in the record support the conclusion that RMA employees hoped they would be able to exclude at least some of the non-irrigated corn acreage in Baca County from insurance coverage. However, the record indicates the RMA exercised its agency expertise by examining scientific evidence relating to various types of farming practices on non-irrigated lands and determining that this specific practice—planting non-irrigated corn on newly broken land without a fallow period—was not a good farming practice. Even if RMA employees subjectively hoped the scientific evidence would allow them to reach this determination, such a subjective hope does not invalidate the objective

scientific evidence supporting the agency's conclusion. Nor does this subjective hope

demonstrate improper bias on the part of agency decisionmakers. Unlike the evidence in

the cases cited by Appellants, the evidence here does not suggest any type of personal

bias or animus against Appellants.[2]

As for Appellants' argument that the negative GFP determination must be

overturned because the agency was improperly motivated by financial concerns,

Appellants cite to no authority for the proposition that an agency acts arbitrarily and

capriciously by making a decision that is partially motivated by the desire to limit the

expenditure of government funds, and we are not persuaded we should adopt such a rule

in this case. Similarly, Appellants cite to no authority for the proposition that an agency's

decision should be overturned if a critical internal report by an investigative arm of the

same government department could potentially have pressured the agency into taking

---

[2] We see no merit to Appellants' argument that we can find bias based on the agency's allegedly inconsistent treatment of non-GRIP policies that contained significantly different GFP language. The differences between these policies' GFP provisions is sufficient to explain any inconsistent treatment, and nothing in the record suggests that the agency's determination was based on personal bias or animus instead.

We further note that Appellants have not cited to any cases invalidating agency decisions based on bias outside of the context of adjudicative proceedings such as administrative hearings. Appellants suggest that cases discussing the right to a fair tribunal in adjudicative proceedings, *see, e.g.*, *Miller v. City of Mission, Kan.*, 705 F.2d 368, 371-72, 387 (10th Cir. 1983) (holding that the due process clause was violated when a police officer's public termination hearing was conducted by a decisionmaker who was biased against him), should be extended to the RMA's GFP determination in this case. Since we reject Appellants' bias argument based on the lack of any evidence of personal animus or bias in this case, we need not decide the merits of this argument.

-12-

some type of responsive action. Appellants cite to a few cases holding that an agency action should not be motivated by extraneous pressures put on agency decisionmakers by individual members of Congress. *See, e.g., D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. 1972) (reversing and remanding agency approval of a bridge project where the chairman of a congressional appropriations committee indicated that money for construction of the subway system would be withheld if the bridge was not approved). However, these cases are about external political pressures from a separate branch of the government, not about internal politicking within a department. We are not persuaded we are required to overturn the RMA's GFP determination based on whatever internal political pressure resulted from the OIG report. Nor are we persuaded the agency's possible motivations to reach a particular result prove that the agency acted in bad faith or violated Appellants' due process rights by reaching this result after finding supportive objective evidence.

The agency relied on objective scientific evidence to conclude that planting non-irrigated corn on newly broken lands in eastern Colorado without a fallow period is not a good farming practice. Appellants provide neither evidence nor argument to call the validity of this scientific evidence into question.[3] Instead, Appellants simply argue the

---

[3] At oral argument, Appellants argued they had no opportunity to dispute this evidence because they were not provided with an administrative hearing and because they knew the agency had already made up its mind before it reviewed the AIPs' GFP determination. However, the record indicates the AIPs and the RMA complied with the applicable procedural requirements (*see* Appellants' App. at 200 ("AIPs should require insureds to provide evidence they followed recognized good farming practices for the

agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion. We are not persuaded this rule is required by our precedents, nor are we persuaded it would be prudent for us to adopt such a rule in this case. *Cf. Horton v. California*, 496 U.S. 128, 138 (1990) (holding in the Fourth Amendment context that "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer"). We therefore reject Appellants' argument that we should overturn the agency's GFP determination based on the agency's subjective motivations.

We turn then to Appellants' argument that the RMA's GFP determination should be reversed under the *Accardi* doctrine, which "require[s] an agency to adhere to the policy and regulations it[] promulgates." *United States v. Thompson*, 579 F.2d 1184, 1191 (10th Cir. 1978) (Seth, J., dissenting) (citing *United States ex rel. Accardi v.*

_____

insured crop in any case where there is any indication they have not done so."); *id.* at 203 ("In deciding if the producer carried out a GFP, the AIP may ask producers to establish that they have complied with policy provisions and followed GFPs.")) by providing Appellants with the opportunity to provide written documentation supporting their argument they followed good farming practices by planting non-irrigated corn on newly broken land (*see* Appellee's Supplemental App. at 132 ("[Argo] reviewed the additional information [Appellant Jacobs] submitted regarding the issue of good farming practices as required by the GRIP policy."); *id.* at 127 ("You also did not provide any published documentation to support the claim that breaking ground and planting without a fallow period is considered a generally recognized good farming practice.").) To the extent Appellants are now attempting to argue that the agency's regular procedures for making GFP determinations are insufficient because they allow only for the submission of written evidence rather than a hearing, any such argument has been waived by Appellants' failure to raise it below.

-14-

*Shaugnessy*, 347 U.S. 260 (1954)). We find this argument unpersuasive for two reasons.

First, the only policies Appellants cite are contained within RMA manuals and

handbooks, not promulgated regulations. Under the reasoning of the en banc court in

*Thompson*, we are not persuaded that the *Accardi* doctrine would apply to these policies,

which appear to be departmental "housekeeping provision[s]" that do not give rise to an

enforceable right. *Id.* at 1189. Second, even if *Accardi* does apply, we are not persuaded

the RMA violated any of its own policies or procedures in this case. Appellants rely on

provisions stating that the initial GFP determination "is the approved insurance provider's

(AIP) responsibility," (Appellants' App. at 190), and that the RMA will either review the

AIP's determination at the farmer's request or will make the initial determination "if the

AIP cannot" (*id.* at 195). However, while these provisions give the AIP responsibility

over the initial GFP determination, they do not prohibit the RMA from giving the AIP

advance notice of the types of practices it is likely to find to satisfy or violate GFP

standards. We see nothing in the cited provisions that would prohibit the RMA from

having the type of informal involvement in the initial GFP determination it did in this

case.

We are also unpersuaded by Appellants' argument that the agency failed to follow

its own procedures when it alluded to allegations of program abuse and fraud in the

district court proceedings without having followed the established procedures for

imposing sanctions for fraud. The agency's GFP determination did not depend on these

allegations, and there is no evidence the agency attempted to impose a sanction for fraud

-15-

or program abuse. Rather, the agency issued its negative GFP determination based on scientific evidence supporting the conclusion it is not a good farming practice to plant non-irrigated corn on newly broken land in eastern Colorado without first allowing for a fallow period to accumulate soil moisture. Under our deferential standard of review, we see no error in the agency's analysis of this question, and we are not persuaded there is any other valid reason for overturning the agency's GFP determination.

We accordingly **AFFIRM** the agency's decision.